United States District Court
Southern District of Texas

**ENTERED**

April 22, 2020

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DEBRA HUNT,                          §
                                     §
        Plaintiff,                   §
                                     §
v.                                   §        CIVIL ACTION NO. H-18-1698
                                     §
MILLENNIUM INFORMATION               §
SERVICES, INC.,                      §
                                     §
        Defendant.                   §

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Defendant's Motion for Summary Judgment (Doc. 24) and Defendant's Motion for Leave to Submit Supplemental Declaration (Doc. 30). The court has considered the motions, the responses, the replies, all other relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's Motion for Summary Judgment be **DENIED**. Defendant's Motion for Leave to Submit Supplemental Declaration is **GRANTED**.

## I.  Case Background

Plaintiff filed this lawsuit against her former employer, asserting sex discrimination in compensation and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"),[2] an

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 36, Ord. Dated Dec. 4, 2019.

[2]     42 U.S.C. §§ 2000e-2000e-17.

unequal pay claim under the Equal Pay Act ("EPA"),[3] and a claim for unpaid overtime wages in violation of the Fair Labor Standards Act ("FLSA").[4]

## A.  **Factual Background**

Defendant provides on-site risk-assessment services to insurance companies for covered properties.[5] Defendant's employees who perform the on-site risk analyses are called Field Quality Consultants ("FQC").[6]

### 1.   **FQC Job Duties**

In a typical day, an FQC would drive to each assigned property and conduct inspections.[7] Defendant's customers specified the type of inspection required, and the scheduled inspection would appear in an FQC's "inventory" with the form to be used for that inspection.[8]  An inspection included a visual inspection of the property, taking photographs and measurements, filling out the form

---

[3]   29 U.S.C. § 206(d).

[4]   29 U.S.C. §§ 201-219.

[5]   See Doc. 24-2, Ex. 1 to Def.'s Mot. for Summ. J. Jared Lindboe Dep. Tr. pp. 34-35.

[6]   See id. p. 20.

[7]   See Doc. 24-3, Ex. 2 to Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. pp. 185-86; Doc. 28-3, Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Lindboe Dep. Tr. p. 44.

[8]   See Doc. 28-3, Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Lindboe Dep. Tr. pp. 35, 59.

for the inspection, and possibly interviewing the property owner.[9] Following an inspection, FQCs uploaded the results of the inspection into Defendant's software program.[10]  Before beginning work each day, an FQC would map out his or her inspections to create an efficient route.[11]

### 2.    Defendant's Texas Business

In the summer of 2016, Defendant acquired a new client located in the Houston, Texas, area that demanded a large number of inspections.[12]  The new client also needed a disproportionate number of interior inspections, which required an FQC to make an appointment with the property owner in order to enter the property.[13]  Due to the spike in workload caused by the new client, Defendant experienced an increased need for FQCs in the Houston area.[14]

----

[9]    See Doc. 24-3, Ex. 2 to Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. pp. 185-86; Doc. 28-3, Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Lindboe Dep. Tr. p. 44.

[10]    See Doc. 24-3, Ex. 2 to Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. pp. 185-86; Doc. 28-2, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. pp. 64-66; Doc. 28-3, Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Lindboe Dep. Tr. p. 44.

[11]    See Doc. 24-3, Ex. 2 to Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. p. 31.

[12]    See Doc. 24-6, Ex. 3 to Def.'s Mot. for Summ. J., Hersheway Decl. p. 1.

[13]    See id.

[14]    See id.; Doc. 28-5, Ex. 4 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Lisa Brady Email pp. 5-6 of 15.

### 3.   Hiring of Todaro

On July 27, 2016, Defendant interviewed Patrick Todaro ("Todaro") for an FQC position in the Houston area.[15]  Todaro had "experience with commercial insurance loss control, Occupational Safety and Health Administration ("OSHA") regulations, and Federal Emergency Management Agency ("FEMA") inspections."[16]  Defendant offered Todaro a position as an FQC.[17]  FQCs had a starting salary of approximately $35,000 to $40,000, but Todaro would not accept the position unless the starting salary was at least $60,000.[18]  Defendant agreed to Todaro's request, and Todaro was hired as an FQC with a starting salary of $60,000.[19]  Todaro began working for Defendant on August 15, 2016.[20]  He worked for six weeks before leaving Defendant's employment.[21]

### 4.   Plaintiff's Employment

Defendant interviewed Plaintiff for a position as an FQC on August 8, 2016.[22]  During the hiring process, Plaintiff asked for

---

[15]   See Doc. 24-6, Ex. 3 to Def.'s Mot. for Summ. J., Hersheway Decl. pp. 1-2.

[16]   See id. p. 2.

[17]   See id.

[18]   See id.

[19]   See id.

[20]   See id.

[21]   See id.

[22]   See id.

a salary between $34,000 and $40,000.[23]  Defendant hired Plaintiff at a starting salary of $40,000 and Plaintiff began working on August 22, 2016.[24]  Approximately six weeks later, Plaintiff requested a salary increase to $50,000; Defendant increased her salary to $42,000.[25]

In late October of 2016, during a phone conversation with Todaro, Plaintiff learned that Todaro's salary was $60,000.[26]  After learning of Todaro's salary, Plaintiff requested a second pay raise and informed Defendant that she thought the pay difference between herself and Todaro was unfair.[27]  Plaintiff's second request for a salary increase was denied.[28]  Plaintiff testified that after making the second request for a salary increase, she was assigned to inspections in high crime areas and locations further from her home.[29]

On January 31, 2017, Plaintiff emailed a supervisor, David Tung ("Tung"), to complain that the area to which she was sent was

---

[23]     See id.

[24]     See id.; Doc. 24-7, Ex. 4 to Def.'s Mot. for Summ. J., Lindboe Decl. p. 1.

[25]     See Doc. 24-4, Ex. 2 to Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. p. 103.

[26]     See id. pp. 106-107.

[27]     See id. pp. 106-109.

[28]     See Doc. 24-6, Ex. 3 to Def.'s Mot. for Summ. J., Hersheway Decl. p. 2.

[29]     See Doc. 24-3, Ex. 2 to Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. p. 123.

dangerous.[30]    Tung  responded  that  he  was  not  aware  of  the
dangerousness  of  the  area  and  would  try  to  be  more  cognizant  of
where  he  sent  Plaintiff.[31]  Tung  also  told  Plaintiff  to  let  him  know
if  he  ever  sent  her  to  another  high  crime  area.[32]  On  February  13,
2017,  Plaintiff  emailed  Tung  to  inform  him  that  he  had  again  sent
her  into  a  high  crime  area.[33]  Tung  asked  Plaintiff  to  send  him  the
policy  number  of  any  problematic  assignments  and  they  would  be
reassigned.[34]  Plaintiff  responded  saying  that  the  problematic  areas
were  in  zip  codes  77099,  77031,  and  77036.[35]   Plaintiff  did  not
receive  assignments  in  those  zip  codes  for  the  remainder  of  her
employment  with  Defendant.[36]

Plaintiff  began  searching  for  another  job  in  January  2017.[37]
Plaintiff  found  a  job  in  March  2017  and  resigned  from  her
employment  with  Defendant  on  March  30,  2017.[38]  On  May  28,  2017,

---

[30]    See Doc. 24-5, Ex. 2 to Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. Ex.
2 Email Chain.

[31]    See id.

[32]    See id.

[33]    See id.

[34]    See id.

[35]    See id.

[36]    See Doc. 24-7, Ex. 4 to Def.'s Mot. for Summ. J., Lindboe Decl. Ex.
4 Assignment Excel Sheet.

[37]    See Doc. 24-3, Ex. 2 to Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. p.
132.

[38]    See id.; See Doc. 24-5, Ex. 2 to Def.'s Mot. for Summ. J., Pl.'s Dep.
Tr. Ex. 13 Resignation Email.

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sex and age discrimination and retaliation.[39]

## B.   **Procedural Background**

Plaintiff filed her original complaint on May 23, 2018.[40]  On September 13, 2019, Defendant filed its pending motion for summary judgment.[41]  On October 10, 2019, Plaintiff filed her response to Defendant's motion for summary judgment.[42]  On October 17, 2019, Defendant filed a motion for leave to submit a supplemental declaration.[43] On the same day, Defendant filed a reply in support of its motion for summary judgment.[44]  On October 28, 2019, Plaintiff filed a response to Defendant's motion for leave to submit a supplemental declaration.[45] On October 31, 2019, Defendant filed a reply in support of its motion for leave to submit a supplemental declaration.[46]

---

[39]    See Doc. 24-8, Ex. 5 to Def.'s Mot. for Summ. J., EEOC Charge of Discrimination.

[40]    See Doc. 1, Pl.'s Orig. Compl.

[41]    See Doc. 24, Def.'s Mot. for Summ. J.

[42]    See Doc. 28, Pl.'s Resp. to Def.'s Mot. for Summ. J.

[43]    See Doc. 30, Def.'s Mot. for Leave.

[44]    See Doc. 31, Def.'s Reply in Support of Mot. for Summ. J.

[45]    See Doc. 34, Pl.'s Resp. to Def.'s Mot. for Leave.

[46]    See Doc. 35, Def.'s Reply in Support of Mot. for Leave.

## II.  Legal Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A., 759 F.3d 498, 504 (5th Cir. 2014).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Coastal Agricultural Supply, Inc., 759 F.3d at 504 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  See id. at 505 (quoting Celotex Corp., 477 U.S. at 323).  If the movant carries its burden, the nonmovant may not rest on the allegations or denials in the pleading but must respond with evidence showing a genuine factual dispute.  See id.  The court must accept all of the nonmovant's evidence as true and draw all justifiable

inferences in her favor.  Coastal Agric. Supply, Inc., 759 F.3d at
505 (quoting Anderson, 477 U.S. at 255).

### III. Motion for Leave

Before considering Defendant's motion for summary judgment,
the court must address Defendant's motion for leave to submit the
supplemental declaration of Angela Hersheway ("Hersheway").   In
this declaration, Hersheway testified that Plaintiff was offered
insurance benefits, but failed to complete the insurance enrollment
process.

In support of its motion, Defendant argues that it was not
aware that Plaintiff was contending that her lack of insurance
benefits constituted either an independent adverse employment
action or evidence of retaliation until she responded to
Defendant's motion for summary judgment.   Defendant posits that
this new theory should be disallowed, or alternatively, Defendant
should be allowed to submit Hersheway's supplemental declaration as
a part of its reply briefing.

Plaintiff counters that she pled the denial of insurance
benefits as an independent adverse employment action and part of
her retaliation claim in her complaint.   Plaintiff also cites to:
(1) her initial disclosures where she mentioned the denial of
healthcare coverage; (2) her response to initial discovery
protocols wherein she included the loss of benefits as part of her
damages; and (3) her deposition testimony wherein she testified

about the denial of her insurance benefits.[47]

In her original complaint, Plaintiff alleged discrimination with regard to "benefits" as a part of her gender discrimination claim and incorporated by reference those same allegations in her retaliation claim.[48]  Also, Plaintiff pleaded lost benefits in the "Damages" and "Relief Requested" sections of her complaint.[49]

While Plaintiff did mention the denial of her insurance benefits during the discovery process, the allegations in the complaint are not so clear.  Plaintiff did not allege the denial of insurance benefits in the fact section of the complaint but merely alleged that as a result of sex discrimination, she was denied "employment rights, benefits, promotions and achievement."[50]  The denial of insurance benefits was not mentioned in the retaliation section at all.[51]  It is understandable that Defendant was not on notice that Plaintiff was claiming that the denial of insurance benefits itself was an adverse employment action or was taken in retaliation for her speaking out about what she perceived to be a discriminatory salary structure.  Accordingly, if necessary, the court will consider Plaintiff's liability theories regarding the

---

[47]    See Docs. 34-1, 34-2, & 34-3, Exs. 1, 2, & 3 to Pl.'s Resp. to Def.'s Mot. for Leave, Pl.'s Initial Disclosures, Pl.'s Resp. to Initial Discovery Protocols, & Pl.'s Dep. Tr.

[48]    See id. p. 9.

[49]    See id. p. 10.

[50]    See Doc. 1, Pl.'s Compl. p. 5.

[51]    See id. p. 6.

denial of her insurance benefits as an adverse employment action and evidence of retaliation, as well as Hersheway's declaration.

Plaintiff also objected to the third and fourth paragraphs of Hersheway's supplemental declaration on the grounds that they contained hearsay and were not based on Hersheway's personal knowledge.  In the third and fourth paragraphs of her declaration, Hersheway testified that another employee, Susan Morris ("Morris"), instructed Plaintiff to email Morris when her "Obamacare" plan expired and Morris would send Plaintiff the documents necessary to enroll in Defendant's insurance plans.[52]  Hersheway also testified that after Morris emailed Plaintiff the enrollment documents, Plaintiff failed to complete the enrollment process.[53]  Hersheway based these statements on business records attached to her declaration.  Hersheway also testified that the facts contained within her declaration were within her personal knowledge and established a factual basis for the admissibility of the records under the business record exception to the hearsay rule.[54]  See Fed. R. Evid. 803(6).

Plaintiff argues that because it was Morris and not Hersheway who dealt with Plaintiff concerning insurance benefits, Hersheway

---

[52]    See Doc. 31-1, Ex. 7 to Def.'s Reply in Support of Mot. for Summ. J., Hersheway Decl. p. 1.

[53]    See id.

[54]    See Doc. 31-1, Ex. 7 to Def.'s Reply in Support of Mot. for Summ. J., Hersheway Decl. & Attachments.

cannot testify about Morris's and Plaintiff's email correspondence. At the summary judgment stage, Federal Rule of Civil Procedure ("Rule") 56(c)(2) allows a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Hersheway established that the emails attached to her declaration were business records, and the emails provide evidence supporting Hersheway's statements in the third and fourth paragraphs.  Thus, regardless of whether Hersheway can personally testify about the communications between Plaintiff and Morris, she authenticated the emails that provide the information.  Further, Defendant could call Morris to testify regarding the contents of the third and fourth paragraphs of Hersheway's declaration if required.  Accordingly, Plaintiff's objections are **OVERRULED**.  See <u>In re TK Boat Rentals, LLC</u>, 411 F. Supp. 3d 351, 374 (E.D. La. 2019)(considering emails on summary judgment where their contents could be presented at trial by the testimony of their authors).

## IV. Analysis

Plaintiff's claims consist of Title VII claims for sex discrimination in compensation and retaliation, an EPA unequal pay claim, and an FLSA claim for unpaid overtime.  Defendant argues that summary judgment is appropriate on all of Plaintiff's claims.

### A.   <u>Title VII Claims</u>

Title VII prohibits employers from "discriminat[ing] against

12

any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In the absence of direct evidence, as is the case here, courts analyze discrimination and retaliation claims under the burden-shifting approach first articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) [hereinafter <u>McDonnell Douglas</u>], and modified in <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003), and <u>Rachid v. Jack In The Box, Inc.</u>, 376 F.3d 305 (5th Cir. 2004). Under this "modified <u>McDonnell Douglas</u> approach," a plaintiff may trigger a presumption of discrimination by establishing a prima facie case. <u>Rachid</u>, 376 F.3d at 312.

After a plaintiff has established a prima-facie case, the burden shifts to the defendant to proffer legitimate, nondiscriminatory reasons for its actions. <u>Alkhawaldeh v. Dow Chem. Co.</u>, 851 F.3d 422, 426 (5th Cir. 2017). If the defendant satisfies this burden, "the burden shifts back to the employee to demonstrate that the employer's proffered reason is a pretext for discrimination." <u>Id.</u>

**1.   Sex Discrimination in Compensation**

The court will focus on Plaintiff's prima facie case before turning to Defendant's proffered legitimate, nondiscriminatory reasons for the pay disparity between Plaintiff and Todaro.

13

### i.   Plaintiff's Prima Facie Case

To make out a prima facie case of discrimination in compensation, a plaintiff must show that she was: (1) a member of a protected class; and (2) paid less than a non-member for work requiring substantially the same responsibility. <u>Taylor v. United Parcel Serv., Inc.</u>, 554 F.3d 510, 522 (5th Cir. 2008)(<u>citing Uviedo v. Steves Sash & Door Co.</u>, 738 F.2d 1425, 1431 (5th Cir. 1984)). "An individual plaintiff claiming disparate treatment in pay under Title VII must show that her circumstances are 'nearly identical' to those of a better-paid employee who is not a member of the protected class." <u>Id.</u> at 523 (citing <u>Little v. Republic Refining Co.</u>, 924 F.2d 93, 97 (5th Cir. 1991)).

Before reaching the gravamen of the parties' arguments regarding Plaintiff's prima facie case, the court will briefly address Defendant's argument that "Todaro is not an appropriate comparator because his starting salary is an outlier among other male FQCs."[55]  Defendant did not cite a case supporting this "outlier" argument.  Instead, Defendant points to the starting salaries of other male FQCs without regard to when they started, where they worked, or any other aspects of their employment.  The court cannot assume that the circumstances of these employees' employment are "nearly identical" to the circumstances of Plaintiff's employment.  Regardless, Todaro is arguably the best

---

[55]    <u>See</u> Doc. 24, Def.'s Mot. for Summ. J. p. 13.

comparator because he and Plaintiff were hired within a week of each other and they both worked in the Houston area.  The court rejects Defendant's outlier argument.

Proceeding to Plaintiff's prima facie case, Defendant argues that Plaintiff cannot show that she had substantially the same job responsibilities as Todaro.  Defendant first argues that Todaro was hired with the intention that he would perform more complicated inspections than other FQCs.  Defendant has not supported its argument with a case that holds that an anticipated change in a comparator's employment is sufficient to show that the plaintiff's and comparator's work did not require the same responsibility.  The court's inquiry is therefore focused on whether Todaro's and Plaintiff's actual work required the same responsibility.  See Schulte v. Wilson Indus., Inc., 547 F. Supp. 324, 332–33 (S.D. Tex. 1982)(rejecting an argument that comparator was more qualified where comparator did not perform duties in addition to those performed by the plaintiff).

Defendant next argues that Todaro worked in a larger territory requiring significantly more travel than Plaintiff's assignment and points to Todaro's traveling over 750 miles more than Plaintiff during his six weeks of employment.[56]  Plaintiff correctly points out that an FQC who works an area with a heavy concentration of jobs would travel far fewer miles than an FQC who had a larger

---

[56]   See Doc. 24-6, Ex. 3 to Def.'s Mot. for Summ. J., Hersheway Decl. p. 2.

territory but could complete more assignments.

Defendant cites two cases in support of its argument that the additional miles driven by Todaro defeat Plaintiff's prima facie case.  See Montgomery v. Clayton Homes Inc., 65 F. App'x 508 (5th Cir. 2003); Garrett v. Argosy Educ. Group, Inc., 3:09-CV-2362-F, 2011 WL 13233849, at *2 (N.D. Tex. Jan. 6, 2011).  In Montgomery, the Fifth Circuit found that the plaintiffs had not shown a prima facie case because the mobile home properties where the plaintiffs worked had substantial differences in duties and responsibilities compared to the properties where the comparators worked.  See Montgomery, 65 F. App'x at 508 n.4.  Montgomery is distinguishable because Defendant has only argued that Todaro drove more, not that the inspections required different work.  In Garrett, the court ruled on a discovery issue finding that information about the plaintiff's qualifications was discoverable.  Garrett, 2011 WL 13233849 at *2.  Garrett is not relevant to the court's inquiry.

Finally, Todaro testified that, based on his conversations with supervisors and Plaintiff, it was his understanding that he and Plaintiff held identical jobs.[57]  This testimony provides strong evidence that Plaintiff's and Todaro's work required substantially the same responsibilities.

Defendant has pointed to no other differences in the job duties of Todaro and Plaintiff.  Accordingly, Plaintiff has raised

---

[57]  See Doc. 28-4, Ex. 3 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Decl. of Todaro p. 1.

16

a prima facie case of sex discrimination in compensation.

### ii. Defendant's Legitimate Nondiscriminatory Reasons

Defendant proffers the following legitimate, nondiscriminatory reasons for the differences in Todaro and Plaintiff's salaries: (1) Todaro was hired when Defendant was in urgent need of an FQC; (2) Todaro was hired with expectations that he would be working a larger area and possibly in California; (3) Todaro had commercial inspection experience and was hired with the expectation that he would eventually perform commercial inspections; and (4) Todaro demanded a higher salary.

To rebut a defendant's legitimate, nondiscriminatory reasons at the summary judgment stage, the plaintiff must produce some evidence "demonstrating that discrimination lay at the heart of the employer's decision." Price v. Fed. Express Corp., 283 F.3d 715, 720 (5th Cir. 2002).

> If the plaintiff can show the employer's asserted justification is false, this showing, coupled with a prima facie case, may permit the trier of fact to conclude that the employer discriminated against the plaintiff without additional evidence. However, such a showing will not always be enough to prevent summary judgment, because there will be cases where a plaintiff has both established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, yet no rational factfinder could conclude that the action was discriminatory. Whether summary judgment is appropriate depends on numerous factors, including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.

<u>Price v. Fed. Exp. Corp.</u>, 283 F.3d 715, 720 (5th Cir. 2002)(internal citations and quotation marks omitted).  A defendant's legitimate, nondiscriminatory reasons are "suspect" where they do not remain the same "between the time of the EEOC's investigation and the ultimate litigation." <u>Burton v. Freescale Semiconductor, Inc.</u>, 798 F.3d 222, 237 (5th Cir. 2015)(citing <u>Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.</u>, 482 F.3d 408, 415 (5th Cir. 2007)).

Plaintiff's employment with Defendant began only one week after Todaro began working for Defendant.  Further, Plaintiff has presented evidence that on August 31, 2016, Lisa Brady, Defendant's Director of Field Operations, emailed all of the FQCs regarding new hires and stated "[w]e are in desperate need of inspectors right now."[58]  Contrary to Defendant's briefing, there is evidence to suggest that Defendant's need for FQCs did not suddenly evaporate when Todaro was hired.

Regarding Defendant's second and third reasons, Plaintiff has presented evidence that when Todaro was hired there was "never a discussion about work outside of Texas, work in a larger Texas territory, work in California, or commercial inspections."[59]  That Todaro was unaware of these purported reasons as a justification for his higher salary calls those reasons into question.  This is

---

[58]    <u>See</u> Doc. 28-5, Ex. 4 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Lisa Brady Email pp. 5-6 of 15.

[59]    <u>See</u> Doc. 28-4, Ex. 3 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Decl. of Todaro p. 1.

especially true given that Defendant alleges it planned that Todaro
would eventually work in California but failed to inform Todaro of
this plan.  Additionally, Todaro had two years of experience with
commercial loss inspections compared to Plaintiff's twelve years.[60]
There is no evidence in the record to suggest that Plaintiff would
not be able to transition into commercial inspections given her
experience.  Finally, Todaro testified that: (1) he and Plaintiff
often overlapped one another geographically when traveling to
inspections; (2) he and Plaintiff were both handling only
residential inspections, not commercial inspections; and (3) based
on his conversations with supervisors and Plaintiff, it was his
understanding that he and Plaintiff held identical jobs.[61] Plaintiff
has presented sufficient evidence to raise a fact issue on the
truthfulness of Defendant's second and third reasons for the pay
disparity.

Although the Fifth Circuit has implied that negotiation can
qualify as a legitimate, nondiscriminatory reason, the Fifth
Circuit directly avoided reaching a holding on the issue.  See
Thibodeaux-Woody v. Houston Cmty. Coll., 593 F. App'x 280, 283–84
(5th Cir. 2014)("To resolve the matter before us, we need not—and
do not—decide whether negotiation is a proper 'factor other than

---

[60]    See id.; Doc. 28-2, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J.,
Pl. Dep. Ex. 1 Pl.'s Resume.

[61]    See Doc. 28-4, Ex. 3 to Pl.'s Resp. to Def.'s Mot. for Summ. J.,
Decl. of Todaro p. 2.

sex.'"").  Regardless, even if the court considers negotiation, that consideration does not end the case at this stage.  Todaro demanded a higher salary than the salary Plaintiff was offered and was granted his demand.  Initially, this appears to provide a legitimate reason for the pay differences.  However, Plaintiff later attempted further negotiation that was unsuccessful in raising her salary to Todaro's level.  Further, Defendant did not proffer negotiation as the basis for the salary difference when the complaint was before the EEOC, making its inclusion at this stage of the litigation "suspect."[62]  See Burton, 798 F.3d at 237. Rather, Defendant stated that the base salary for Todaro's position was raised to $60,000.[63]  In its reply brief, Defendant attempted to clarify its statement to the EEOC by explaining that the base salary was only raised for Todaro's position specifically, not the FQC position in general.[64]

Plaintiff has provided sufficient evidence for a jury to reject each of Defendant's legitimate, nondiscriminatory reasons. However, it must also be reasonable for a jury to find that the pay discrepancy is discriminatory.  Here, there is evidence that Plaintiff and Todaro were hired at the same time, for the same position, yet Todaro was paid $20,000 more than Plaintiff.

---

[62]    See Doc. 28-3, Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Def.'s EEOC Position Statement p. 22 of 43.

[63]    See id.

[64]    See Doc. 31, Def.'s Reply in Support of Mot. for Summ. J. pp. 10-11.

Following Plaintiff's later request, the gap was only narrowed by $2,000.

Plaintiff has also presented evidence that some of the reasons for the pay discrepancy that Defendant gave to the EEOC could be false. For example, Defendant's "emergency need" rationale was heavily rebutted by Defendant's statement after Plaintiff's hiring that Defendant was in "desperate need" of FQCs.[65] A jury could consider those statements as circumstantial evidence of discrimination. Burton, 798 F.3d at 237 (citing Miller v. Raytheon Co., 716 F.3d 138, 144 (5th Cir. 2013)).

For these reasons, whether Defendant discriminated against Plaintiff regarding her salary is a fact question that a jury must resolve.

### 2. Retaliation

When reviewing Title VII retaliation claims, a similar McDonnell Douglas framework used for discrimination claims is also applied. The prima facie elements of a retaliation claim are: "(1) the employee engaged in an activity protected under Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between the protected activity and the adverse employment action." Fisher v. Lufkin Indus. Inc., 847 F.3d 752, 757 (5th Cir. 2017).

---

[65] See Doc. 28-3, Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Def.'s EEOC Position Statement p. 22 of 43; Doc. 28-5, Ex. 4 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Lisa Brady Email pp. 5-6 of 15.

"Protected activities consist of (1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing." Rodriquez v. Wal-Mart Stores, Inc., 540 F. App'x 322, 328 (5th Cir. 2013)(unpublished)(internal quotation marks omitted)(citing Dias v. Goodman Mfg. Co., 214 S.W.3d 672, 676 (Tex. App.-Houston [14th dist.] 2007, pet. denied)). "Complaining about unfair treatment without specifying why the treatment is unfair, however, is not a protected activity." Tratree v. BP N. Am. Pipelines, Inc., 277 F. App'x 390, 395 (5th Cir. 2008)(unpublished)(citing Harris-Childs v. Medco Health Solutions, 169 F. App'x 913 (5th Cir. 2006)). "[I]f the conduct complained of by the plaintiff had nothing to do with race, color, religion, sex, or national origin, a retaliation claim cannot be maintained under Title VII." Bartz v. Mitchell Ctr., A-05-CA-959-LY, 2008 WL 577388, at *2 (W.D. Tex. Jan. 23, 2008). "Magic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." Brown v. United Parcel Serv., Inc., 406 F. App'x 837, 840 (5th Cir. 2010)(citing Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 348–49 (5th Cir. 2007)).

Defendant argues that Plaintiff did not engage in a protected activity. Plaintiff argues that her complaints about unequal pay constituted protected activity. The court agrees.

22

Plaintiff testified that when she complained about her pay, she did not label the pay disparity as sex discrimination, but complained that it was unfair that Todaro was being paid more than she.[66]  Defendant argues that Plaintiff's complaint did not alert Defendant that Plaintiff believed unlawful discrimination was at issue.  Notably, however, Plaintiff made this complaint to Defendant's Director of Field Operations who discussed the complaint with Defendant's Director of Operations.[67]  In her complaint, Plaintiff pointed out a specific male comparator who was hired one week before she was hired at a salary that was fifty percent higher than hers.  If Defendant's argument is that its management team did not understand that Plaintiff might be complaining about the salary differential based on gender because she did not use the terms "discrimination" or "disparate treatment based on sex," it may make that hair-splitting argument to the jury.  But see Mathis v. FedEx Corp. Services, Inc., CIV.A. H-12-1871, 2014 WL 1278182, at *8 (S.D. Tex. Mar. 27, 2014)(granting summary judgment on Title VII retaliation claim where the plaintiff "never complained to anyone in human resources that she believed she was being treated differently because of her gender").  The court finds that Plaintiff has alleged sufficient

---

[66]   See Doc. 24-3, Ex. 2 to Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. pp. 108-09.

[67]   See Doc. 28-5, Ex. 4 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Emails p. 6 of 15.

facts to meet the first element of her prima facie case of retaliation.

Turning to the next element, an "adverse employment action" in the context of a retaliation claim is where such action would have dissuaded a reasonable employee from making or supporting a charge of discrimination. See Burlington Northern & Santa Fe Railway Co. V. White, 548 U.S. 53, 68 (2006).

Plaintiff claims that in retaliation for her salary complaint, she was denied insurance benefits and sent to jobs in high crime areas. Regarding the high crime areas, Defendant has provided a spreadsheet exhibit that shows how often each FQC was sent to the complained-of zip codes.[68] Notably, Plaintiff was sent to these zip codes once prior to her complaint about the pay differential.[69] In the months following her complaint, Plaintiff was sent to these zip codes for inspections twenty-eight times.[70] Plaintiff was not sent to these zip codes after her complaint to Tung.[71]

Regarding insurance benefits, Plaintiff testified that Defendant refused to put her on its health insurance plan in January of 2017. Plaintiff also testified that she discovered that Defendant failed to send in her completed enrollment paperwork for

---

[68]    See Doc. 24-7, Ex. 4 to Def.'s Mot. for Summ. J., Lindboe Decl. Ex. 4 Assignment Excel Sheet.

[69]    See id.

[70]    See id.

[71]    See id.

its life insurance plan.[72]  Defendant's representative testified that Plaintiff failed to complete her enrollment paperwork for both insurance plans.[73]

The rapid change in Plaintiff's assignments and the issues with her insurance could be coincidental and unrelated to Plaintiff's complaints about her salary.  However, the potential loss of insurance benefits and dangerous work assignments might dissuade a reasonable employee from complaining about discrimination.  Accordingly, there is a fact issue regarding whether Defendant took these actions as retaliation for Plaintiff's complaints about salary.

**B.    <u>EPA Claim</u>**

The EPA prohibits an employer from discriminating on the basis of sex when paying wages "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  29 U.S.C. § 206(d)(1).  EPA claims are also analyzed using the burden-shifting framework set forth in <u>McDonnell Douglas</u>.  <u>Browning v. Sw. Research Inst.</u>, 288 F. App'x 170, 173, 174 (5th Cir. 2008)(unpublished).  In order to establish a prima facie case under the EPA, a plaintiff must show that: (1) her employer is subject to the EPA; (2) she performed work in a position requiring equal skill, effort and

---

[72]    See Doc. 28-2, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. pp. 149-151.

[73]    <u>See</u> Doc. 31-1, Ex. 7 to Def.'s Mot. for Summ. J.

responsibility under similar working conditions; and (3) she was paid less than a comparable employee of the opposite sex.  <u>Chance v. Rice Univ.</u>, 984 F.2d 151, 153 (5th Cir. 1993)(citing <u>Jones v. Flagship Int'l</u>, 793 F.2d 714, 722-23 (5th Cir. 1986)).

Defendant argues that Plaintiff cannot establish a prima facie case because it is impermissible to use a single comparator and Todaro is not a proper comparator.  For the reasons discussed above, the court has rejected the argument that Todaro is not a proper comparator.

In support of its other argument, Defendant cites Eighth and Ninth Circuit case law where the average wages of male employees was considered rather than a single comparator.  <u>See Hein v. Oregon Coll. of Educ.</u>, 718 F.2d 910, 916 (9th Cir. 1983); <u>Heymann v. Tetra Plastics Corp.</u>, 640 F.2d 115, 122 (8th Cir. 1981).  Neither of these cases has been adopted as precedent by the Fifth Circuit and only represent one approach to determining liability.  Second, Defendant again cites to the starting salaries of its male FQCs without regard to when these FQCs began their employment with Defendant, where they worked, or any other characteristics of their employment.  The court cannot say that these male FQCs are nearly identically situated to Plaintiff without this information.  Regardless, Todaro is the most similarly situated to Plaintiff because he was hired at nearly the same time and also worked in the Houston area.  Here, Plaintiff has provided evidence that a single

26

comparator, hired shortly before she was, for a nearly identical position, was paid $20,000 more.   This is sufficient for Plaintiff's prima facie case.

As Plaintiff has established a prima facie case, the burden shifts to Defendant to prove that its decision was "made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." Corning Glass Works v. Brennan, 417 U.S. 188, 196 (1974). Defendant argues that its decision was based on negotiation, a factor other than sex.  As discussed above, it is an open question in the Fifth Circuit whether negotiation alone can count as a factor other than sex.  Even if the court considers negotiation an appropriate factor other than sex, as discussed above, a jury must decide whether the salary disparity between Plaintiff and Todaro was a result of legitimate negotiation or was a result of gender discrimination.

## C.   **FLSA Claim**

The FLSA provides a general rule that an employer must pay its employees overtime compensation for hours worked in excess of forty per week.  29 U.S.C. § 207(a)(1); see also Vela v. City of Houston, 276 F.3d 659, 666 (5th Cir. 2001).

Under 29 U.S.C. § ("Section") 207(a), the FLSA requires covered employers to compensate nonexempt employees at overtime rates for time worked in excess of statutorily defined hours.

27

Section 216(b) creates a cause of action for employees against employers violating the overtime compensation requirements. Section 213(a)(1) exempts employees occupying "bona fide executive, administrative, or professional" positions from the overtime requirements of Section 207. These terms "are [to be] defined and delimited from time to time by regulations of the Secretary [of Labor]." 29 U.S.C. § 213(a)(1).

The regulations applicable to the relevant time frame provide that an exempt administrative employee is one: (1) compensated at a rate of not less than $455 per week; "(2) [w]hose primary job duty is the performance of office or non-manual work directly related to management or general business operations of the employer or the employer's customers; and (3) [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(2019)(amended 2020).

The only dispute between the parties regarding Plaintiff's FLSA claim is whether Plaintiff was an exempt administrative employee during her employment with Defendant. Plaintiff argues that she performed nonexempt regular inspection work as discussed in the regulations:

> Ordinary inspection work generally does not meet the duties requirements for the administrative exemption. Inspectors normally perform specialized work along standardized lines involving well-established techniques and procedures which may have been catalogued and described in manuals or other sources. Such inspectors

> rely on techniques and skills acquired by special
> training or experience. They have some leeway in the
> performance of their work but only within closely
> prescribed limits.

29 C.F.R. § 541.203(g). Defendant argues that Plaintiff's work was more closely related to that of an exempt insurance claims adjuster as discussed in the regulations:

> Insurance claims adjusters generally meet the duties
> requirements for the administrative exemption, whether
> they work for an insurance company or other type of
> company, if their duties include activities such as
> interviewing insureds, witnesses and physicians;
> inspecting property damage; reviewing factual information
> to prepare damage estimates; evaluating and making
> recommendations regarding coverage of claims; determining
> liability and total value of a claim; negotiating
> settlements; and making recommendations regarding
> litigation.

29 C.F.R. § 541.203(a). Defendant's argument fails because Plaintiff's employment did not involve adjusting insurance claims. Plaintiff inspected properties before a loss, not property damage in connection with an insured event. Plaintiff did not prepare damage estimates, make recommendations regarding claim coverage, determine liability or total value of claim, negotiate settlements, or make recommendations regarding litigation.

Turning to the elements of the administrative exemption, a recent Fifth Circuit case is instructive on the second element. See Fraser v. Patrick O'Connor & Associates, L.P., 18-20687, 2020 WL 1647196, at *3 (5th Cir. Apr. 3, 2020), as revised (Apr. 7, 2020). In Fraser, the Fifth Circuit held that property-tax consultants did not qualify for the administrative exemption because their work did

not "directly relate to assisting with the running of the company, as opposed to simply doing work related to the production of the business's products or services." Id.  The Fifth Circuit found that "[n]o consultant helped run or service any business, no consultant was ever a supervisor or manager, and no consultant formulated management policies, provided tax advice, prepared tax returns, or helped with regulatory or legal compliance." Id.  In rejecting the defendant's administrative exemption argument, the Fifth Circuit found that the defendant was in the business of tax reduction and the "property-tax consultants provided that service to the company's clients." Id.

Here, Defendant is in the business of providing risk-assessment services to insurance companies related to their insured properties.  Defendant's main service was to provide on-site property inspections to its clients.  As in Fraser, Defendant's FQCs are the employees that actually provided the service that was sold to Defendant's customers.  Accordingly, under Fraser, FQCs do not qualify for the second element of the administrative exemption.

Alternatively, considering the third element of the administrative exemption, Defendant argues that Plaintiff regularly exercised independent judgment and discretion when she:

> (1) determined the number of inspections to complete on any given work day; (2) found ways to accomplish the greatest number of inspections on a work day, based on property owner availability, and identify and set her schedule for the day from a myriad of options; (3) decided how long to spend on each property to complete a

30

> thorough inspection; (4) determined how to complete each
> inspection assignment within fourteen days by assessing
> multiple factors, including location and inspection type;
> and (6) determined the best and most efficient route for
> the work day.[74]

In other words, Plaintiff exercised independent judgment and discretion in determining how she scheduled her assigned inspections.   Defendant also argues that Plaintiff exercised independent discretion and judgment in that she identified potential hazards and determined whether a property or condition of the property presented a hazard or potential risk.

The "exercise of discretion and independent judgment must relate to matters of consequence." Lott v. Howard Wilson Chrysler-Plymouth, Inc., 203 F.3d 326, 331 (5th Cir. 2000) (citing 29 C.F.R. § 541.207(b)-(c)(1)).   At best, there is a fact issue regarding whether Plaintiff's determination of her schedule amounted to a matter of consequence to her employer.

Regarding the identification and determination of hazards and risks, Plaintiff's job was heavily constricted by the forms that accompanied each inspection she was assigned.[75]   These forms contained numerous boxes that Plaintiff would check based on whether each condition, item, hazard, or risk was present.[76] Defendant attempts to characterize an inspection as Plaintiff's

---

[74]    See Doc. 24, Def.'s Mot. for Summ. J. pp. 35-36.

[75]    See Doc. 28-3, Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Lindboe Dep. Ex. 7 Forms pp. 27-43 of 43.

[76]    See id.

exercise of independent discretion to evaluate all the risks and hazards that property posed. However, the forms that the FQCs filled out directly belie that assertion.[77]

The evidence presented to the court could fall within the regulation's language that Plaintiff had "some leeway in the performance of [her] work but only within closely prescribed limits." See 29 C.F.R. § 541.203(g). As such, there is a fact issue regarding whether Plaintiff's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). As Defendant cannot establish the second or third elements of the administrative exemption as a matter of undisputed fact, summary judgment should be denied as to Plaintiff's FLSA claim.

### V.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's Motion for Summary Judgment be **DENIED** on all claims. Defendant's motion for leave to submit supplemental declaration is **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual

---

[77]    See id. pp. 40-41.

findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.   Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 21st day of April, 2020.

_____
Nancy K. Johnson
United States Magistrate Judge